UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL LAW AND POLICY, a Washington non-profit corporation, and COLUMBIA RIVERKEEPER, a Washington non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES BUREAU OF RECLAMATION, an agency of the Department of the Interior, and MICHAEL L. CONNOR, in his official capacity as Commissioner of the Bureau of Reclamation,<br><br>Defendants. | NO. CV-09-160-RHW<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

Before the Court are Plaintiffs' Motion for Summary Judgment (Ct. Rec. 68) and Defendants' Cross Motion for Summary Judgment (Ct. Rec. 82). A hearing on these motions was held on April 14, 2010. For the reasons set forth below, the Court grants Defendants' motion and denies Plaintiffs'.

I. BACKGROUND

The Center for Environmental Law and Policy and Columbia Riverkeeper sued the United States Bureau of Reclamation and Michael L. Connor for violations of the National Environmental Policy Act ("NEPA"). Plaintiffs allege that Defendants failed to release a timely Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") on the Lake Roosevelt Drawdown Project, contrary to NEPA requirements. After this action began, Defendants

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** * 1

completed an EA and issued a Finding of No Significant Impact ("FONSI"). Plaintiffs complain that these measures were both untimely and inadequate. Plaintiffs request a declaratory judgment that Defendants violated NEPA, and also request injunctive relief to prevent Defendants from taking action related to the Project.

This case arises out of Defendant Bureau of Reclamation's Columbia Basin Project ("CBP"), which annually diverts 2.65 million acre-feet of water from the Columbia River for irrigation. The CBP also includes the Grand Coulee Dam, which generates hydroelectric power from the flow of the Columbia River. Defendant has currently completed the first half of the CBP, and now seeks to engage in a phased development of the second half. This includes the project at issue here: the Lake Roosevelt Incremental Storage Releases Project, also known as the Lake Roosevelt Drawdown Project. This project seeks to annually divert tens of thousands of acre-feet of water from Lake Roosevelt, the reservoir formed behind Grand Coulee Dam, for irrigation use in the Odessa Subarea. The Project would decrease the level of Lake Roosevelt by one foot in most years, and by 1.8 feet in drought years (approximately once every 26 years).

In 2004, the Bureau of Reclamation entered into a Memorandum of Understanding ("MOU") with Washington State and the three irrigation districts served by the CBP (one of whom intervenes here on behalf of Defendants). The MOU details the parties' plans to work together to increase the availability of Columbia River water for various uses through projects including the Lake Roosevelt Drawdown Project. The MOU also acknowledges that the Bureau of Reclamation's action were subject to compliance with Reclamation law, including NEPA.

Two years later, Washington State enacted legislation directing the Department of Ecology to "aggressively pursue the development of instream and out-of-stream [water] uses," including releases of water from Lake Roosevelt.

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** \* 2

RCW 90.90.005. In response, Ecology developed a policy advisory group composed of various tribal and local governments, federal and state agencies, and stakeholder groups. In 2007, Washington State signed Water Resources Management Agreements with the Confederated Tribes of the Colville Reservation and the Spokane Tribe of Indians, in which the state "agreed to provide annual payments to the tribes to mitigate potential damage to fish and wildlife, recreation and cultural activities resulting from the release of water from Lake Roosevelt, and for economic development investments to benefit the local economy." (Final EA, LR-A000023).

In 2005, the Bureau of Reclamation submitted a water rights application to the Department of Ecology for the Lake Roosevelt Drawdown Project. The Bureau later withdrew this application and submitted amended applications in 2008. Ecology issued two secondary water use permits for the Lake Roosevelt Project on December 1, 2008. Plaintiffs filed this lawsuit the same day. Defendants thereafter released a draft EA on March 20, 2009, and a final EA and FONSI on June 12, 2009, and Plaintiffs amended their Complaint accordingly. Previously, the Court permitted Vision for Our Future, an environmental organization located within the jurisdiction of the Confederated Tribes of the Colville Indian Reservation, to intervene as a Plaintiff, and East Columbia Basin Irrigation District and the Washington State Department of Ecology to intervene as Defendants.

## II. APA STANDARD OF REVIEW

The parties agree that the Court's standard of review is set by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA, the Court must determine whether the Board's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." If the Court can "examine the relevant data and articulate a rational connection between the facts found and the choice made," Defendants' decision should be affirmed. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1032 (9th Cir. 2008) (quoting *Pub. Citizen*

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** * 3

*v. DOT*, 316 F.3d 1002, 1020 (2003)).

### III. DISCUSSION

Plaintiffs make two basic arguments: that Defendants violated NEPA by beginning to implement the Project before complying with NEPA, and that the EA Defendants later prepared was flawed in three respects.

**A. Timing of the EA**

Plaintiffs first argue that Defendants violated NEPA's strict timing requirements by beginning implementation of the Project before preparing NEPA documentation and soliciting public comments. Plaintiffs cite NEPA's implementing rules, providing that "[u]ntil an agency issues a record of decision... no action concerning the proposal shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a); *see also Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) ("An assessment must be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.") (internal quotations and citations omitted).

Plaintiffs argue that Defendants impermissibly limited the range of reasonable alternatives by (1) entering into the MOU before engaging in the NEPA process; and (2) seeking and obtaining water rights required to implement the Project, and only later approving the Project through an EA and FONSI. According to Plaintiffs, these "water rights committed the agency to a course of action that precluded alternatives to achieve the goals of the Project, most notably employing water conservation alternatives to supply new uses and/or providing more water for instream flows." (Plaintiffs' Memorandum in Support, Ct. Rec. 69, p. 9). Plaintiffs compare these facts to those of several cases in which the Ninth Circuit held that agencies violated NEPA by irretrievably committing themselves to courses of action before engaging in the NEPA process. *See, e.g.*, *Pit River Tribe v. U.S.*

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** * 4

*Forest Service*, 469 F.3d 768, 782-83 (9th Cir. 2006) (finding that leases and lease extensions were an irreversible commitment where the leases did not reserve to the agencies "an absolute right to deny exploitation of those resources," and preserved only the agencies' rights to limit development when not inconsistent with the lease rights); *Metcalf*, 214 F.3d at 1143-44 (agency violated NEPA by committing to a whaling proposal in writing and only later preparing a "slanted" EA); *Conner v. Burford*, 848 F.2d 1441, 1451 (agency violated NEPA by failing to prepare NEPA documents before selling leases that relinquished "the ability to prohibit potentially significant inroads on the environment").

Defendants respond by first pointing out that the EA and FONSI at issue here were not created in a vacuum, but instead relied heavily on and incorporated Environmental Impact Statements prepared by the Washington Department of Ecology in 2007 and 2008. Defendants thus argue that the EA at issue here reflects "the ongoing cooperative work being undertaken by the State and Federal Government agencies." (Defendants' Memorandum in Support, Ct. Rec. 83, pp. 10-11).

Defendants next argue that the MOU did not constitute an irreversible commitment. Defendants cite the language of the MOU itself, which sets forth the parties' commitment only to "use their best efforts in working collaboratively and in good faith to secure economic and environmental benefits from improved water management both within the federal Project and along the mainstem of the Columbia River by advancing the actions described in this MOU." (LR-B004239, § 3). Defendants also point out that the MOU expressly specified that it created no legal obligations binding any of the parties, and that no existing water supplies or water rights would be impaired as a result of the MOU. Defendants thus distinguish the MOU from the agreements at issue in *Metcalf*, where an agency would have incurred liability for breaching a contract entered into before preparing an EA. 214 F.3d at 1144.

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** \* 5

Defendants also dispute Plaintiffs' argument regarding the water rights permits, arguing that "mere possession of a water right does not trigger any action because the holder cannot perfect that right *until* that water has been applied to a recognized beneficial use." (Ct. Rec. 83, p. 14) (citing RCW 90.03.320). Defendants concede that if they had taken some action to divert and use water under the permits, such action would trigger a duty to comply with NEPA. However, Defendants argue that the sequence of events here complies fully with NEPA, because Defendants issued a final EA and FONSI before taking any such action.

As noted above, Defendants attempt to distinguish *Metcalf* at length by arguing that neither the MOU nor the water use permits irretrievably committed Defendants to any course of action, unlike the binding contracts the agencies signed in *Metcalf*. Moreover, Defendants point out that *Metcalf* itself states that "this case does not stand for the general proposition that an agency cannot begin preliminary consideration of an action without first preparing an EA, or that an agency must always prepare an EA before it can lend support to any proposal." 214 F.3d at 1145.

Plaintiffs concede in their reply that the MOU did not trigger NEPA's requirements. However, Plaintiffs argue that the water use permits constituted an irrevocable commitment because Defendants could not proceed with a project that used water in any other way than that authorized in the permits. Plaintiffs also reiterate their argument that the permits constituted a point of commitment that effectively foreclosed the consideration of any "non-diversion" alternatives. (Plaintiffs' Reply Memorandum, Ct. Rec. 89, p. 9).

Defendants reply that "from both a legal and practical perspective, there is nothing impermissible or inappropriate in the Bureau's considering the Project in 2004, working closely with Ecology to develop the proposal, but waiting until 2008 to prepare the EA, once it developed a discrete proposal for <u>federal</u> action."

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** \* 6

(Defendants' Reply Memorandum, Ct. Rec. 93). Defendants point out that the real issue before the Court is not when project consideration began, but whether Defendants complied with NEPA requirements "before taking action with environmental impacts or limiting a choice of reasonable alternatives."

The Court finds that Defendant's final point here is the key question: did obtaining the permits improperly limit the EA's scope of reasonable alternatives? If so, it constituted the "go-no-go" point of commitment that itself triggered NEPA requirements. If not, then Defendants properly waited until after the permits were obtained to prepare an EA. The Court can only answer this question by looking at the EA's consideration of alternatives. In other words, what Plaintiffs set out as a separate argument about timing is in fact subsumed within Plaintiffs' overall challenge to the sufficiency of the EA. If that EA, including its consideration of alternatives, is sufficient, then the sequence of events here would not violate NEPA.

**B. Sufficiency of the EA**

Plaintiffs challenge three aspects of the EA: (1) its consideration of cumulative effects; (2) its consideration of indirect impacts; and (3) its consideration of reasonable alternatives.

*1. Cumulative Effects*

Even where the identifiable impacts of a specific project are insignificant, significantly cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005) (internal quotations omitted). "[I]n considering cumulative impact, an agency must provide some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* (internal quotations omitted).

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** * 7

Plaintiffs argue that the final EA fails to take a "hard look" at cumulative impacts, and instead "relies on general statements about possible effects and fails to provide any quantified and detailed information on the cumulative impacts." (Ct. Rec. 69, p. 11). Plaintiffs note that the final EA's section on cumulative impacts is only one page and a half, and relies heavily on the cumulative impacts analysis in Ecology's programmatic EIS. Plaintiffs point out that the final EA does not discuss any specific past actions. Plaintiffs argue that the final EA's conclusion that no significant cumulative impacts would occur because the impacts of the Project would be small to immeasurable "omits the heart of the cumulative impacts analysis by failing to *add* the incremental impacts of the Project to past, present, and reasonably foreseeable future actions." (Ct. Rec. 69, p. 13) (emphasis in original). Plaintiffs liken this case to *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Management*, 387 F.3d 989, 993-96 (9th Cir. 2004), where the Ninth Circuit found inadequate a generalized cumulative impacts section of an EA that failed to take into account the combined effects of reasonably foreseeable future actions.

Federal Defendants do not address this issue, but instead defer to Intervener-Defendant Washington Department of Ecology. Ecology describes the analyses of its two environmental impact statements (incorporated by reference into this EA) and argues that the statements "taken together contain an exhaustive discussion of the potential impacts, positive and negative of the Project, including the potential cumulative effects of additional projects." (Ecology's Memorandum in Response, Ct. Rec. 79, p. 9). Ecology attempts to distinguish *Klamath-Siskiyou* by arguing that "the present action is not one of a series of similar actions that taken together may have cumulative effects... the Project does not involve a new diversion from the River but instead involves making better use of an existing diversion that was authorized in 1938." (Ct. Rec. 79, p. 10). Ecology argues that an exhaustive discussion of the history of related projects is unreasonable, citing *League of Wilderness Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1217-18 (9th Cir. 2008)

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** \* 8

(holding that an agency may consider cumulative effects in the aggregate, rather than delving into the historical details of individual past actions). Ecology also argues that the final EA need not consider the effects of future projects that are currently speculative, including the Odessa Subarea Special Study.

Plaintiffs reply by first arguing that federal agencies cannot "tier" to a non-NEPA document. "Tiering" is a process by which a narrow EA or EIS can refer to a previous broader EIS's coverage of general matters. 40 C.F.R. § 1508.28. The final EA stated that it was incorporating Ecology's two EISs under NEPA's regulations providing that "agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action." 40 C.F.R. § 1502.21. Federal Defendants' memo argued that the Bureau of Reclamation was permitted to "tier" the final EA off of Ecology's two EISs. (Ct. Rec. 83, p. 19).

However, Plaintiffs point to Ninth Circuit case law holding that "tiering to a document that has not itself been subject to NEPA review is not permitted." *League of Wilderness Defenders*, 549 F.3d at 1219 (quoting *Kern v. U.S. BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002). Plaintiffs also argue that 40 C.F.R. § 1502.21, on which the final EA relied, applies to EISs, not EAs, and that at least one district court has held that NEPA's regulations do not allow for incorporation by reference in an EA. *Natural Res. Defense Council v. Duvall*, 777 F. Supp. 1533, 1538-39 (E.D. Cal. 1991). Even if the Court can consider the EA's incorporation of the two EISs by reference, Plaintiffs argue that the documents fail to meet federal NEPA standards.

Federal Defendants concede that the concept of "tiering" was misused in their initial memorandum in support. (Defendants' Reply Memo, Ct. Rec. 93, p. 7). However, Defendants maintain that incorporation by reference in an EA is encouraged by the regulations, notwithstanding the district court case Plaintiffs cite. In support, Defendants cite the Council for Environmental Qualities' "Forty

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** * 9

Most Asked Questions Concerning CEQ's NEPA Regulations," 46 Fed. Reg. 18026, which provides that EA may incorporate background material by reference.

On the issue of incorporation by reference, the Court finds that Defendants have the better of argument. *Duvall* reasoned that EAs should stand on their own and provide sufficient information within their four corners to facilitate public comment. 777 F. Supp. at 1538-39. While that is true, the Court sees no reason why an EA could not refer to other documents so long as it sufficiently summarizes the relevant portions of those documents, as this final EA does. Moreover, it would be wasteful and inefficient for a federal agency to simply copy and paste a state agency's work where, as here, that work is the result of a long ongoing collaboration between the two agencies. Therefore, the Court finds that the final EA's incorporation of the two EISs is appropriate.

After reviewing the final EA and Ecology's two EISs, the Court concludes that the cumulative impacts analysis here complies with NEPA. While the relevant section of the final EA is brief, the document as a whole and the prior documents it incorporates contain a thorough discussion of the history of development of the region and the place of the Lake Roosevelt Drawdown Project within that history. Most importantly, Plaintiffs fail to identify any specific projects that Defendants failed to consider. While Plaintiffs make much of the Odessa Subarea Special Study, it is abundantly clear from the record that Defendants considered that project in response to comments, in the body of the final EA, and in the FONSI. Defendants point out that no alternatives currently under consideration in the Odessa Subarea project have been determined to be feasible, and therefore it is unclear at this stage whether the project will even go forward. Given those circumstances, the project appears far from "reasonably certain," and the Court cannot conclude that Defendants' treatment of the project in the cumulative effects analysis was arbitrary or capricious.

The Court agrees with Defendants that these circumstances are substantially

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** \* 10

distinct from those in *Klamath-Siskyou*, 387 F.3d at 993-96. There, federal agencies prepared NEPA documents on several projects proceeding simultaneously, yet failed to adequately consider the cumulative impacts of the projects taken together. In contrast, the project at issue here is not a companion project to any other federal actions under consideration, because any future projects in the region remain too speculative to fully analyze at this stage. While the Lake Roosevelt Drawdown Project does not exist in a vacuum, the NEPA documents at issue thoroughly account for the history of development in the region and the project's cumulative impacts thereto. Accordingly, the Court finds that the final EA and FONSI comply with NEPA's cumulative impacts analysis requirement, and rejects Plaintiffs' argument on this issue.

*2. Indirect Effects*

NEPA's implementing regulations also require the consideration of reasonably foreseeable "indirect effects," which "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

Plaintiffs argue that the increased surface water supply authorized under the Project would induce growth within the CBP and in downstream municipalities and industry. Plaintiffs argue that the EA entirely fails to consider the indirect impacts this induced growth may have. Plaintiffs argue that the Project will facilitate development of the Odessa Subarea, but the final EA fails to address this indirect impact. Finally, Plaintiffs argue that the EA also fails to consider what impacts the Project may cause by facilitating "a host of new growth and activities along the Columbia River." (Ct. Rec. 69, p. 16).

Ecology responds by arguing that these kinds of indirect impacts were discussed in the PEIS, which is again incorporated by reference into the final EA. Ecology cites the PEIS's discussion of effects on socioeconomics and land use in

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** * 11

the Odessa and downstream communities, concluding that the increased water supply would allow the continuation of existing agricultural activities. The PEIS also concluded that the growth the Project might induce in small and widespread communities is uncertain, and any new projects would be subject to both municipalities' own growth management plans and independent environmental review.

Plaintiffs reply that a major proposed component of the Project, the Weber Siphon expansion, had not "crystallized" at the time the PEIS was written, and thus was not considered in that document. (Plaintiffs' Reply Memo, Ct. Rec. 89, pp. 15-16). Plaintiffs also argue that the final EA fails to summarize and disclose the portions of the PEIS on which it relies with respect to indirect impacts. Finally, Plaintiffs argue that reliance on communities' own growth management plans (which two counties at issue lack) cannot by itself render the Project's indirect impacts insignificant.

As with the EA's and EISs' analysis of cumulative impacts, the Court concludes that these documents' consideration of indirect impacts is sufficient. The PEIS does go into substantial detail about foreseeable indirect impacts, and also explains why certain elements of growth are speculative and uncertain. *See* LR-B003989-90. The EA summarizes and incorporates this analysis. *See* LR-A000060, 62. Like its impacts on the Odessa Subarea project, the indirect impacts the Lake Roosevelt Drawdown Project may have on communities' growth remains speculative at this stage. Any such indirect impacts will be subject to multiple factors outside of Defendants' current control, including communities' own choices about growth and future projects' compliance with state and federal environmental law. Accordingly, the Court finds that Defendants' analysis of indirect impacts complies with NEPA, and denies Plaintiffs' motion on this basis.

*3. Reasonable Alternatives*

"NEPA requires the agencies to 'study, develop, and describe appropriate

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** \* 12

alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (quoting 42 U.S.C. § 4332(2)(E)). This provision requires agencies "to give full and meaningful consideration to all reasonable alternatives," and applies to both an EIS and an EA. *Id.* However, agencies have a lesser obligation to consider obligations in an EA, and need only include "a brief discussion of reasonable alternatives." *Id.* Under this lesser obligation, consideration of only two alternatives (a no action alternative and a preferred alternative) may suffice. *Id.* at 1153-54. Agencies may define reasonable alternatives as those that serve a project's identified purpose and need, but "[a]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 586 F.3d 735, 746 (9th Cir. 2009) (internal quotation omitted).

The final EA considers two alternatives: a no-action alternative and the proposed project. Plaintiffs argue that Defendants unreasonably limited the scope of alternatives by narrowly defining the goal of the Project: "to improve water management in the Columbia River Basin by *releasing additional water* from Lake Roosevelt." (LR-A000016, emphasis added). Plaintiffs argue that by treating the release of additional water as a given, Defendants overlooked several reasonable alternatives that do not include the release of additional water, such as: (1) increased water conservation measures; (2) water markets that transfer water to more valuable areas; and (3) reversion from irrigated to dry-land farming in key areas. (Plaintiffs' Statement of Facts, Ct. Rec. 70, p. 23).

Ecology argues that the final EA expressly relies on the SEIS's discussion of alternatives. The SEIS, in turn, incorporated the PEIS's discussion of alternatives.

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** \* 13

The SEIS discusses at least two of the alternatives suggested in Plaintiffs' briefing – conservation and water markets – and declines to "carry them forward." (LR-B002166 – 68). Ecology argues that the Bureau of Reclamation "was entitled to rely on the States' alternatives analysis and was under no obligation to address alternatives the State had already eliminated." (Ecology's Memo in Response, Ct. Rec. 79, p. 16).

Plaintiffs reply that the final EA does not actually summarize and discuss any portions of the PEIS and SEIS on which the EA's alternatives analysis relies. Regardless, Plaintiffs argue that the alternatives analysis in the two state documents is inadequate. Plaintiffs point out that even though the SEIS briefly discusses some alternatives it does not carry forward, the heart of the SEIS's alternatives section considers only two alternatives: the proposed project, in different forms, and a no-action alternative. Plaintiffs again reiterate their argument that the final EA's narrow definition of purpose impermissibly limited the scope of available alternatives.

Ecology replies that Plaintiffs appear to "confuse the rejection of these alternatives with a failure to analyze them." (Ecology's Reply Memo, Ct. Rec. 95, p. 9). Ecology reiterates the SEIS's conclusion that "conservation and water marketing... do not by themselves meet the legislative directive to develop a variety of water supply options and distribute the water to a variety of end users," citing RCW 90.90.0110(2).

On balance, the Court finds that Defendants have the better of the argument. Again, it would be unreasonable and inefficient to require a federal agency to merely reiterate a state agency's work, particularly where that work is the product of ongoing collaboration between the two sets of agencies. It is clear from the record that federal Defendants carefully reviewed the state agencies' consideration of alternatives, and accepted their conclusions as reasonable. Moreover, during the federal process the agency received comments on and reviewed the same kinds of

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** \* 14

alternatives Plaintiffs now propose. And perhaps most importantly, this project represents the culmination of a long collaborative process between multiple stakeholders, including state and tribal agencies, public utility districts, irrigation districts, and environmental groups. The final EA details this diverse policy group's influence on policy choices, priorities, and the consideration of alternatives (LR-A000015). Given this backdrop, the Court does not find the final EA's consideration of alternatives to be arbitrary or capricious.

Returning to the timing of the EA, discussed above, the Court rejects Plaintiffs' argument that Defendants' procurement of water rights permits before preparing NEPA documents unreasonably limited the scope of alternatives Defendants considered. Rather, Defendants and their state counterparts considered and reasonably rejected the very alternatives Plaintiffs propose. As Defendants point out, this project was not developed in a vacuum, but rather built upon and incorporated an extensive history of collaboration between multiple stakeholders. Merely obtaining the water rights permits did not commit Defendants to a specific choice of action; rather, Defendants retained the discretion to move forward with the project or not. As such, the final EA and FONSI preceded the "go-no-go" step of the process, and thereby complied with NEPA. Therefore, the Court denies Plaintiffs' motion on this issue.

## IV. CONCLUSION

The Court finds that Defendants complied with NEPA's timing requirement by preparing a final EA and FONSI before the "go-no-go" stage of the Lake Roosevelt Drawdown Project's development. The Court further finds that the final EA and FONSI adequately considered alternatives to the project, as well as the project's cumulative and impacts. Therefore, the Court grants Defendants' motion and denies Plaintiffs.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiffs' Motion for Summary Judgment (Ct. Rec. 68) is **DENIED.**

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** * 15


2. Defendants' Cross-Motion for Summary Judgment (Ct. Rec. 82) is **GRANTED.**

3. Plaintiffs' Motion to Strike (Ct. Rec. 96) is **DENIED as moot**.

4. The District Court Executive is directed to enter judgment in favor of Defendants and against Plaintiffs.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order, provide copies to counsel, and **close the file.**

**DATED** this 21st day of May, 2010.

*s/Robert H. Whaley*
ROBERT H. WHALEY
United States District Court

Q:\CIVIL\2009\CELP\SJ.ord.wpd

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** * 16